UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JASON TUCKER, JASEN GUSTAFSON,
DANIEL BARRON, and MARSHALL
HAMPTON,

               Plaintiffs,

            v.

LATOYA HUGHES, Acting Director of
the Illinois Department of Corrections,
and DION DIXON,

               Defendants.

No. 18 CV 3154

Judge Manish S. Shah

MEMORANDUM OPINION AND ORDER

Plaintiffs Jason Tucker, Jasen Gustafson, Daniel Barron, and Marshall Hampton challenge the constitutionality of the Illinois Department of Corrections' policies restricting their access to the internet while on mandatory supervised release for sex offense convictions. All plaintiffs seek compensatory damages from defendant Dion Dixon, the former IDOC Director, for violations of their First Amendment and due process rights under previous versions of the policies. Hampton and Tucker also seek damages for alleged violations stemming from IDOC's former host site policy, which prohibited them from living in a host site with internet access. Gustafson and Hampton, who are still on supervised release, also bring claims for injunctive and declaratory relief against defendant Latoya Hughes, the Acting IDOC Director, based on policies from March 2020 and December 2023. The parties move for summary judgment.

## I.    Legal Standard

Summary judgment is warranted if there are no genuine disputes of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "'Material facts' are facts that 'might affect the outcome of the suit,' and a dispute as to those facts is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Hunter v. Mueske*, 73 F.4th 561, 565 (7th Cir. 2023) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A court need consider only the cited materials, but it may consider other materials in the record. Fed. R. Civ. P. 56(c)(3).

Because the parties cross-move for summary judgment, I consider the facts in the light most favorable to plaintiffs when evaluating IDOC's motion and in the light most favorable to IDOC when evaluating plaintiffs' motion. *See First State Bank of Monticello v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 567 (7th Cir. 2009). To the extent a disputed fact relates to both sides' motions, I set forth the parties' respective positions. I do not vouch for either side's version of the facts. *See Gates v. Bd. of Educ.*, 916 F.3d 631, 633 (7th Cir. 2019). I consider the evidence as a whole, without regard to which party offered the evidence. *See Torry v. City of Chicago*, 932 F.3d 579, 584 (7th Cir. 2019).

## II.    Facts

There are approximately 1,720 people under the supervision of IDOC's Sex Offender Supervision Unit, which is staffed by 64 parole agents. [248] ¶¶ 67–68.[1] District 1, which encompasses Cook County, has 25 parole agents supervising 893 individuals. [248] ¶¶ 67–68.

Pursuant to the Illinois Code of Corrections, persons with sex offense convictions on mandatory release cannot have access to the internet without IDOC's permission. 730 ILCS 5/3-3-7(b)(7.6)(i). The law requires access monitoring and permits the Parole Board to place appropriate restrictions on a parolee's use of the internet. 730 ILCS 5/3-3-7(b)(7.6)(ii)–(iv). The Board may also require a sex offender parolee to reside at IDOC approved locations. 730 ILCS 5/3-3-7(b-1)(1).

The Board prohibited parolees with sex offense convictions from possessing, accessing, or using any device with internet capability without the prior written

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. When a document has numbered paragraphs, I cite to the paragraph, for example [1] ¶ 1.

The facts are largely taken from defendants' response to plaintiffs' Local Rule 56.1 statement, [233], plaintiffs' response to defendants' Local Rule 56.1 statement, [248], and defendants' answer to plaintiffs' statement of additional facts, [254], where both the asserted fact and the opposing party's responses are set forth in one document. Any fact not properly controverted is admitted. N.D. Ill. Local R. 56.1(e)(3); *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). I disregard all immaterial facts and legal conclusions. General objections to how facts are characterized, *see* [233] ¶¶ 12, 20, 33, 40, 55, 91, 136; [248] ¶¶ 19, 23, 29, 33, are sustained and I omit the characterizations and cite to the underlying evidence when possible. I ignore all facts included in statements or responses that are not supported by the parties' evidence. N.D. Ill. Local R. 56.1(d)(2), (e)(3); *see* [233] ¶¶ 5, 71, 90, 97, 101, 115–16. Where the parties dispute facts and both rely on admissible evidence, I set forth both sides' facts. *See* [233] ¶¶ 4, 8, 10, 13, 22, 32, 36, 57, 64, 73, 93; [248] ¶¶ 3, 26–27, 32, 68.

approval of an IDOC agent, and required parolees' consent to searches of devices that could access the internet or store electronic files. [233] ¶ 2.

It is within IDOC's discretion to apply the general restrictions imposed by the Parole Board. [233] ¶ 3. Defendant Dion Dixon was IDOC's Deputy Chief of Parole from 2010 until he retired in July 2020. [233] ¶ 123. In his capacity as the head of the Sex Offender Supervision Unit, he was responsible for "working to develop or … refresh policies and procedures that govern[ed] the supervision of parolees." [233] ¶¶ 124, 128–31. Defendant Latoya Hughes is IDOC's current Acting Director. [211] at 10 n.1.

IDOC presents two rationales for its host site and internet access policies: public safety and the parolee's reintegration. [233] ¶ 53; [248] ¶¶ 10–11.

## A. Host Site Policy

Around 2006, IDOC prohibited sex offenders on supervised release from living in a host site where there was internet access, including via smartphones, smart TVs, or internet-capable gaming systems. [233] ¶¶ 4, 135. Host site applications were evaluated on a case-by-case basis and, if appropriate, a parolee could be allowed to live at a host site with internet access. *Id.* This prohibition was not changed until early 2019. [233] ¶ 136.

## B. Internet Access Policy

IDOC's internet policy has changed at least five times over the period involved in this case. Before 2018, IDOC applied the condition prohibiting the use of any "device with internet capability without the prior written approval of an [IDOC] agent" as prohibiting any internet use. [233] ¶ 5. IDOC began to consider revisions to

4

this policy after the United States Supreme Court's decision in *Packingham v. North Carolina*, 582 U.S. 98 (2017), which held that a social media ban on registered sex offenders (not on supervised release) was unconstitutional. [233] ¶ 6.

### 1.    *August 2018 and June 2019 Policies*

In August 2018, IDOC amended its internet policy to prohibit internet access "as a default" for all parolees. [233] ¶¶ 8, 12. Individuals convicted of "internet-related" offenses were banned from having any internet access for the duration of their supervised release. [233] ¶ 8. Individuals whose offenses were unrelated to the internet could request access. *Id.* These requests were evaluated on a case-by-case basis by a "containment team," which could include the parole agent, the parole commander, the sex offender therapist,[2] and any other therapists involved with the parolee. [233] ¶¶ 8, 12. Therapists' input was "giv[en] considerable weight." [233] ¶ 12. The policy did not provide any formalized instructions on how to decide whether to allow internet access. *Id.* The decision was "left to the discretion and judgment of the containment team." *Id.* Even when granted access, the policy prohibited any access to "blogs, forums, and/or discussion groups," and any "social media websites." [233] ¶ 8.

In July 2019, IDOC created an Internet Use Plan/Agreement form that parolees had to sign if granted access. [233] ¶ 9. The agreement provided that parolees could only use the internet for "job searching, resume writing, and managing

---

[2] IDOC offers free sex offender therapy treatment, but parolees can seek outside sex offender therapists as well. [233] ¶ 48.

5

any bank or credit accounts." *Id.* Use of the internet for "entertainment, social networking[,] shopping[,]" and streaming video was prohibited. [233] ¶¶ 9, 13.

Both the August 2018 policy and the July 2019 Use Plan only allowed access on an approved computer with approved monitoring software, which the parolee had to obtain and pay for. [233] ¶¶ 8, 10.

### 2. *March 2020 and December 2023 Policies*

IDOC issued a new policy in March 2020. [233] ¶ 14. Other than where noted, the provisions of the March 2020 policy remain in place today under the December 2023 policy. *See* [248] ¶ 12. Subject to certain limitations, individuals with crimes unrelated to the internet could have access if they installed monitoring software. [233] ¶ 15; [248] ¶ 1. For parolees who committed internet-related crimes, internet access was prohibited presumptively. [233] ¶ 16; [248] ¶ 2. But they could obtain access with "specific permission" from the containment team. [233] ¶ 17.

If granted access, these individuals also needed to use monitoring software on their devices. [233] ¶ 18. The monitoring software was configured to automatically block access to websites containing a list of preset keywords, pornography, and chat rooms. [254] ¶ 14. It could be configured to block additional content at an agent's discretion. *Id.* Generally, the software did not require customization to function effectively because it was preconfigured to flag "high risk event[s]." *Id.* The software automatically emailed an agent when a parolee visited anything deemed a "high risk" activity based on a pre-set profile for persons with sex offense convictions. [254] ¶ 15. An "event log" that summarized the parolees' internet activity, including screenshots of anything identified as meriting further review, was sent to the agent weekly. [254]

6

¶ 16. Unless there was a high-risk alert that required immediate follow-up, it was IDOC's typical practice to review the summary once a week. [254] ¶ 17. The containment team had the discretion to determine when an individual could transition to internet access without monitoring. [248] ¶ 33.

Under the March 2020 policy, all individuals who were given internet access could not "share, view, download, upload, or discuss pornographic, romantic, or sexual material." [233] ¶ 19. The policy did not define romantic or sexual material. *Id.* When determining if something was "romantic," parole agents considered a parolee's treatment and history. *Id.* Parole agents, in consultation with the containment team, decided what "romantic or sexual" materials were permitted. *Id.*

This provision was removed in the December 2023 policy. [248] ¶¶ 12–13. Instead, parolees could not:

> [V]isit, access, download, or use any website, computer program, or application to share, view, download, upload, or discuss sexual material determined to be detrimental to pro-social sexual functioning as determined by the containment team or clinical recommendation based on identified risk factors. Detailed information on the specific limitations on your ability to share, view, download, upload, or discuss sexual material will be provided in your internet use plan/agreement.

[248] ¶ 13.

The March 2020 policy removed the blanket ban on social media and "entertainment" websites. [233] ¶ 22. The July 2019 Internet Use Plan was not amended to remove the ban until August 2021. *Id.* But for parolees with an internet-related offense, the policy limited internet access "to counseling, education, religion, and employment-related purposes." [233] ¶ 20.

7

The December 2023 policy amended this provision to specify that access for individuals with internet-related crimes "may be limited to areas such as counseling, education, religion and employment-related purposes." [248] ¶ 14. The containment team had the discretion to determine what limits were appropriate on a parolee's internet use. [248] ¶ 15.

Under all iterations of the internet access policy, the containment team could modify the terms of a parolee's internet access plan based on their individual needs. [233] ¶¶ 8, 10, 13, 20, 22, 57, 64; [248] ¶ 30.

The policy did not establish any written criteria for considering a parolee's request for internet access. [233] ¶ 28. According to IDOC, this was due to the highly individualized nature of decisions related to a parolee's internet access. *Id.*; [248] ¶¶ 27–31. Containment teams determined requests on "a case-by-case basis" and considered various factors, including the parolee's criminal history, risk, time on supervision, successful completion of sex offender treatment, social networks, support systems, polygraph results, prior gang involvement, prior internet use, engagement with treatment and the containment team, employment status, history of drug use, and actuarial tools (e.g., static risk assessment). [248] ¶¶ 26–27, 29, 31. This list of potential criteria was not exhaustive because "the context of the situation [wa]s so important into making these decisions." [233] ¶ 29.

As of October 2023, IDOC employed four sex offender therapists (and had five open positions). [233] ¶ 46. Parolees could also seek out private therapists. *See* [233] ¶ 48. IDOC's witnesses testified that the approval of a therapist was "required" before

8

internet access would be granted. [248] ¶ 3. Therapists who were asked to approve access had the discretion to use any criteria. [233] ¶ 30; [248] ¶ 32. IDOC could not override or dictate community-based therapists' individual policies. [233] ¶ 30; [248] ¶ 32. Both IDOC's and plaintiffs' expert witnesses questioned whether therapists should have the final say on when and whether a parolee can have internet access. [233] ¶ 33. IDOC's expert testified that it "would be helpful" for some therapists to have the ultimate authority to determine internet access, but only "[d]epending on the therapist, and [if] they don't abuse [that authority]." *Id.* She did not know "if it'd be sensible" to permit this ultimate authority because she didn't "know what criteria [therapists] use" in deciding a request. *Id.*

All IDOC-employed therapists were supervised by or were in the chain of command that ultimately reported to Sarah Brown-Foiles, the Manager of Sex Offender Services and the Chair of the Illinois Sex Offender Management Board. [233] ¶ 41. Brown-Foiles testified that therapists' approaches to requests varied. [233] ¶ 34. According to her, in reaching a decision, the therapist would consider their knowledge of the parolee and weigh the potential risk to the community that could result from the parolee having internet with the parolee's desire or need for internet access. [248] ¶ 3. In her experience, "some treatment providers [we]re very shy to recommend any type of internet access." [233] ¶ 34. She testified that "there is no clear-cut policy, nor should there be" when making these determinations. [248] ¶ 29.

9

The policy did not set any deadline for containment teams to decide whether to allow internet access or respond to a request. [233] ¶¶ 27, 32; [248] ¶ 28. IDOC attributed this to the individualized nature of access decisions. [233] ¶ 27; [248] ¶ 28.

If denied internet access, the parolee could appeal by submitting a written form to their agent. [233] ¶ 23. The policy provided that the "Deputy Chief of Parole or his or her designee" would review and provide a written decision on appeals within 60 days. [233] ¶¶ 23, 42. There was no written criteria of what to consider when deciding an appeal. [233] ¶ 43.

Brown-Foiles was designated as the individual responsible for deciding appeals. [233] ¶¶ 36–37; [248] ¶ 9. If Brown-Foiles consulted with the containment team about, or if she supervised the therapist involved in, the appealed access decision, she recused herself and the appeal was determined by her supervisor, Alyssa Williams, IDOC's Assistant Director. [233] ¶ 38; [248] ¶ 9. Parole Chief Jason Garnett could also answer appeals. [233] ¶ 39.

## C. Plaintiffs

Plaintiffs are or were on mandatory supervised release for sex offense convictions. Plaintiff Jason Tucker was convicted of predatory criminal sexual assault—his offense was unrelated to internet use. [233] ¶ 75. He completed incarceration in April 2015. [233] ¶ 76. He remained imprisoned an additional 953 days because he could not secure a host site without internet access. [233] ¶¶ 76–78. He was released in November 2017 and requested internet access multiples times from then until August 2019, when he was given permission to access the internet for banking and job searching. [233] ¶¶ 78, 82–83. He was not granted internet access

for personal use until March 2020. [233] ¶ 85. He was discharged from supervised release in March 2021. [248] ¶ 34.

Plaintiff Marshall Hampton was convicted of aggravated criminal sexual assault unrelated to internet use. [233] ¶ 95. His sentence of incarceration ended in April 2018, but he was not released until June 2019 because he did not have an approved host site without internet access. [233] ¶¶ 96–97. He was released in June 2019 after IDOC changed its policy about internet access in a host site. [233] ¶ 98. He asked for and was denied internet access shortly after release. [233] ¶¶ 101–02. His appeal was denied. [233] ¶ 103. In 2020, he was permitted to use the internet for medical appointments, social security, and banking. [233] ¶ 104. He was permitted use in his home in October 2020, though he was still prohibited from having social media access. [233] ¶ 106. As December 2023, he was still on supervised release. [249] at 33.

Plaintiff Jasen Gustafson was convicted of aggravated possession of child pornography, an internet-related crime. [233] ¶ 87. He was incarcerated for six years and released in February 2019. [233] ¶ 88. He requested internet access in August 2019. [233] ¶ 91. His request was denied, as well as his appeal. *Id.* He was approved for internet access in October 2023 and signed the Internet Use Plan in January 2024. [255] ¶¶ 1, 4. As of December 2023, he was still on supervised release. [249] at 33.

Plaintiff Daniel Barron was convicted of criminal sexual assault and was incarcerated from June 2014 to December 2017. [233] ¶ 108. After his release, he asked his parole agent about internet access and was told "it wasn't going to happen."

11

[233] ¶ 112. In early-mid 2019, he was allowed limited access for educational and work purposes. [233] ¶ 115. Around September 2020, Barron was approved for internet access for personal use with monitoring software. [233] ¶ 117. He was still prohibited from accessing social media. [233] ¶ 118. His supervised release ended in June 2021. [213-10] at 13:18–14:1.

All plaintiffs seek damages from Dixon for alleged due process and First Amendment violations suffered because of IDOC's enforcement of various versions of its internet policies. [211] at 10. Hampton and Tucker also seek damages for alleged violations stemming from IDOC's former host site policy. [211] at 68.

Gustafson and Hampton sue Hughes to enjoin the enforcement of the March 2020 policy, arguing that its content restrictions, initial ban, and the length of the initial ban are overly broad in violation of the First Amendment. [211] at 10. They challenge the March 2020 policy's content restrictions on "romantic material" as vague in violation of their substantive due process rights. [211] at 51. They also bring procedural due process claims on the basis that the policy allegedly does not provide a neutral decisionmaker, criteria, deadlines for determinations, or a meaningful opportunity to be heard. [211] at 37. Gustafson and Hampton still pursue these claims based on the December 2023 policy.

## III. Analysis

### A. Damages Claims Against Dixon

Dixon argues that Tucker's and Hampton's claims against him related to IDOC's host site policy are barred by the statute of limitations. [232] at 61–62. He

12

also argues that he is entitled to qualified immunity on all claims brought against him based on the internet policy. [233] at 56–60. I agree with him on both points.

### 1. Statute of Limitations

Section 1983 does not contain an express statute of limitations, so federal courts adopt the forum state's statute of limitations for personal injury claims. *Bowers v. Dart*, 1 F.4th 513, 518 (7th Cir. 2021). In Illinois, the limitations period for personal injury claims is two years. *Owens v. Evans*, 878 F.3d 559, 563 (7th Cir. 2017). Dixon was named as a defendant in the Third Amended Complaint filed on June 26, 2020. [140]. Thus, any damages arising from the host site policy before June 26, 2018, are barred.

"Section 1983 claims accrue when the plaintiff knows or should know that [his] constitutional rights have been violated." *Savory v. Lyons*, 469 F.3d 667, 672 (7th Cir. 2006) (quotation omitted). A two-part inquiry determines the accrual of claims. *Id.* The court must first identify the injury. *Id.* Then, it must determine the date on which the plaintiff could have sued for that injury, i.e. when the plaintiff knew or should have known that his constitutional rights were violated. *Id.*

Plaintiffs' injury was the denial of their host site applications. [249] at 46–48. The relevant accrual date is when they were informed of this denial. *See Savory,* 469 F.3d at 672.

Plaintiffs argue that § 1983 claims are subject to the continuing violation doctrine, which allows plaintiffs to seek damages resulting from the application of a policy even if the violations began more than two years before filing the complaint. [249] at 47 (citing *Savory*, 469 F.3d at 672; *Turley v. Rednour*, 729 F.3d 645, 651 (7th

13

Cir. 2013)). The continuing violation doctrine applies "when a state actor has a policy or practice that brings with it a fresh violation each day." *Savory,* 469 F.3d at 672.

In their characterization, IDOC's denial of plaintiffs' host site applications caused Hampton and Tucker ongoing harm within the two years preceding June 26, 2020, and therefore they timely brought their claims against Dixon. [249] at 46–48. Hampton was imprisoned after his April 2018 release date until June 2019, when IDOC reconsidered its denial of his proposed host site after IDOC's policy changed. [233] ¶ 96; [254] ¶ 11. If the policy had not prohibited Tucker from living in a household with internet access, Tucker would have lived with his mother or family friends for at least a year so he could have worked and saved up money before moving out on his own. [254] ¶¶ 12–13. Plaintiffs argue that they are entitled to seek damages for these ongoing harms. [249] at 48.

The continuing violation doctrine is not applicable here. The key inquiry is whether IDOC's denial of Tucker's and Hampton's host site applications "was a fresh act each day, or whether it was a discrete act that took place upon the first refusal that merely had lingering consequences." *See Savory,* 469 F.3d at 673. Plaintiffs' alleged ongoing harms were persisting effects of the original denials, not fresh acts restarting the limitations period. Continued imprisonment was a natural consequence of the discrete act that occurred when IDOC denied Hampton's host site application.[3] And Tucker's added expenses due to not living with family or friends

---

[3] As plaintiffs have taken pains to point out, they are not attacking the fact or duration of their confinement. [249] at 14. If a judgment in a plaintiff's favor would "necessarily imply the invalidity of [his] conviction or sentence," the plaintiff must bring that claim in a habeas

was not a fresh act imposed by the denial, but a natural consequence of living alone. Each host site denial was a discrete act that triggered the running of the statute of limitations.

Tucker was released from custody in November 2017, meaning the host site denials took place well before the two-year statute of limitations period. *See* [233] ¶¶ 76–78. Hampton was aware in April 2018 that the only reason that IDOC denied his proposed host site was because it had internet. [254] ¶¶ 7–9. Thus, his claim accrued at the latest in April 2018. *See id.* Tucker and Hampton's claims against Dixon based on the host site policy are barred by the statute of limitations.

### 2. *Qualified Immunity*

Dixon argues that he is protected by qualified immunity against all plaintiffs' claims based on the internet access policy. Qualified immunity protects officials who make reasonable, albeit mistaken, judgments about undecided legal questions from civil liability. *Asher v. al-Kidd*, 563 U.S. 731, 743 (2011). To overcome immunity, plaintiffs must show that (1) the official's conduct violated a constitutional right; and (2) the right was "clearly established" at the time of the alleged violation. *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018). Courts need not address the first issue to consider the second. *Id.* at 546–47.

---

petition. *Heck v. Humphrey*, 512 U.S. 477, 487 (1994). Hampton does not challenge his ongoing imprisonment. [249] at 14. If he were, § 1983 would not be open to him, thus, the only injury I consider is the denial of a host site. *See Savory*, 469 F.3d at 673. Defendants argue that plaintiffs' substantive claims are barred by the *Heck* doctrine and that plaintiffs must seek habeas relief instead. [232] at 20. Judge Lee already rejected this argument twice. [93] at 7–11; [156] at 5–7. I see no reason to depart from Judge Lee's rulings.

A right is clearly established when it is sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful. *Id.* at 547. "It is essential to evaluate the public official's conduct at the correct level of granularity." *Holloway v. City of Milwaukee*, 43 F.4th 760, 767 (7th Cir. 2022). Typically, plaintiffs must point to a "closely analogous case" finding the alleged violation unlawful to show that the law was "clearly established." *Reed*, 906 F.3d at 547. They do not need to provide "an identical case, 'but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)). Courts first look to controlling Supreme Court precedent and circuit decisions on the issue. *Id.* If no controlling precedent exists, courts review all relevant caselaw to determine "whether there was such a clear trend in the caselaw that [they] can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Id.*

Plaintiffs proffer six cases in support of their argument that the law was clearly established. Plaintiffs discuss *Packingham v. North Carolina*, 582 U.S. 98, 108 (2017), which held that a policy banning registered sex offenders from accessing social media was unconstitutional. [249] at 52. But *Packingham* specifically addressed persons who were no longer subject to supervision. 582 U.S. at 107–08. Many circuit courts have found *Packingham* inapposite when considering internet bans in the supervised release context. *See, e.g., United States v. Rock*, 863 F.3d 827, 831 (D.C. Cir. 2017); *United States v. Halverson*, 897 F.3d 645, 658 (5th Cir. 2018); *United States v. Carson*, 924 F.3d 467, 473 (8th Cir. 2019); *United States v. Peterson*, 776

16

F.App'x 533, 534 n.2 (9th Cir. 2019); *United States v. Bobal*, 981 F.3d 971, 977–78 (11th Cir. 2020).

Plaintiffs also cite Seventh Circuit cases rejecting blanket bans on internet access as a condition of parole for specific offenders. [249] at 51 (citing *United States v. Holm*, 326 F.3d 872, 877–78 (7th Cir. 2003); *United States v. Scott*, 316 F.3d 733, 737 (7th Cir. 2003)). These cases involved a different standard than at issue here and considered the individual circumstances of parolees in depth. *See Holm*, 326 F.3d at 877–78; *Scott*, 316 F.3d at 736–37. The court of appeals also refused to hold that "limitations on Internet access cannot be justified at all," *Scott*, 316 F.3d at 736, and has since upheld access bans as a condition of parole, *see, e.g., United States v. Angle*, 598 F.3d 352, 361 (7th Cir. 2010).

The Illinois Supreme Court applied *Packingham* to the supervision context in 2019. In *People v. Morger*, the court held that a social media ban on parolees with sex offense convictions violated the First Amendment. 2019 IL 123643, ¶¶ 58–59. *Morger* was limited to parolees with sex offense convictions unrelated to the internet, and thus, it would not apply to Gustafson. 2019 IL 123643, ¶ 58. Even if *Morger* is "closely analogous," it was decided in November 2019 so Dixon would be entitled to qualified immunity for alleged violations before then. And IDOC revised its policy in March 2020 to comply with *Morger*. [253-1] ¶ 2.

The other cases plaintiffs cite, *People v. Galley*, 2021 IL App(4th) 180142, and *United States v. Goodpasture*, No. 21-1264, 2021 WL 4859699 (7th Cir. Oct. 19, 2021), were decided a year after Dixon retired. *See* [233] ¶ 123.

17

Plaintiffs have failed to show that the right of sex offenders on supervised release to access the internet was clearly established. They point to no controlling law that prohibits the state from restricting sex offender parolees' internet access. They only present one case, *Morger*, which does not establish the "robust consensus of cases of persuasive authority" required to show a right was "clearly established." *See al-Kidd*, 563 U.S. at 741–42. Dixon is entitled to qualified immunity on all plaintiffs' claims against him based on the internet policy.

## B. Mootness

Gustafson and Hampton, who are currently on mandatory supervised release, seek declaratory and injunctive relief against IDOC's Acting Director Hughes, arguing that the internet policy violates their First Amendment and due process rights. [211] at 36–64. Hughes challenges Gustafson's and Hampton's claims for injunctive and declaratory relief as moot because IDOC changed its policy during the briefing of these motions. [232] at 19–20, 39–41, 51–52.

### 1. *Gustafson's First Amendment Claims Based on the Initial Ban*

When he moved for summary judgment in June 2023, Gustafson was subject to the policy's presumptive, initial ban on internet access for parolees with internet-related crimes. [212] ¶¶ 91, 93. In October 2023, Gustafson's containment team approved internet access for him. [255] ¶¶ 4–5; [248] ¶ 44. As of January 2024, he signed the Internet Use Plan and was free to use the internet once he obtained monitoring software. [255] ¶¶ 4–5. Hughes argues that Gustafson's claims for injunctive and declaratory relief based on the presumptive ban are now moot. [232] at 19. According to Hughes, there is no longer an "actual, ongoing controversy" and

Gustafson no longer has a "personal stake" in the outcome of the claim. [232] at 19–20. Gustafson argues that the government has failed to meet its burden of showing the controversy is truly extinguished. [257] at 2–4.

The standard for determining whether a defendant's voluntary cessation of challenged conduct moots a case is stringent. *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 189 (2000). Subsequent events must make it "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* "When defendants are public officials . . . greater stock [is placed] in their acts of self-correction, so long as they appear genuine." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 645 (7th Cir. 2020). A public entity is entitled to the presumption that it acts in good faith. *Id.* at 646–47.

Gustafson relies on *Federal Bureau of Investigation v. Fikre*, 601 U.S. 234, 241 (2024), in which the Supreme Court explained that the government cannot render a case moot through the "simple expedient of suspending its challenged conduct after it is sued." *See* [262] at 1–2. The government's burden is to establish that the challenged conduct cannot reasonably be expected to resume. *Fikre*, 601 U.S. at 241.

Gustafson argues the good faith presumption is not applicable here and "there is no suggestion that IDOC doesn't intend to enforce the policy in the future." [257] at 3. According to Gustafson, there is nothing stopping his therapist from changing their mind and revoking internet access. [257] at 3–4. In that sense, the danger of Gustafson being deprived of internet access in the future is extant.

19

But any future revocation of Gustafson's access would not re-subject him to the initial ban for parolees with internet-related offenses. As Hughes points out, Gustafson must show that he is still personally subject to the initial ban to challenge it. [261] at 1–2 (citing *H.P. v. Naperville Comm. Unit Sch. Dist. #203*, 910 F.3d 957, 960 (7th Cir. 2018) (holding a claim is moot when "a court's decision can no longer affect the rights of the litigants.")).

Gustafson's First Amendment and due process claims for injunctive and declaratory relief based on the initial ban and the length of the initial ban are moot.

### 2. *First Amendment Claim Based on Content Restrictions*

The March 2020 internet policy provided that, if access were granted to individuals with internet-related crimes, "such use *shall* be limited to counseling, education, religion, and employment-related purposes." [233] ¶ 20 (emphasis added). The policy no longer requires such restrictions. Since December 2023, "if use is permitted, such use *may* be limited to areas such as counseling, education, religion and employment-related purposes." [244-6] ¶ 10(g) (emphasis added).

Hughes argues that Gustafson's challenge to the March 2020 provision is now moot because the new policy language eliminates the mandate to limit internet access to these categories. [232] at 39–40. Gustafson has presented no evidence that IDOC did not make this change in good faith. The good faith presumption applies, and I agree Gustafson's injunctive and declaratory claims based on the March 2020 language are moot.

Hughes also argues that because Gustafson's Use Plan does not contain any special restrictions on content, beyond the general restrictions applicable to all sex

20

offenders on parole, Gustafson's challenge to the current policy restrictions is moot as well. [255] ¶ 6. According to her, there is limited risk that Gustafson would be subject to these constraints because the Use Plan contains clear guidelines about what actions are prohibited and when Gustafson's internet access could be restricted or revoked. [261] at 3. Yet looking at his Use Plan, there are no criteria or guidelines on when and whether access can be restricted or revoked. *See* [255-1] at 2. And according to the policy, Gustafson's access "may" still be content restricted to "counseling, education, religion and employment-related purposes." [244-6] ¶ 10(g). Gustafson argues that while the new policy language has changed, IDOC officials maintain the power to impose the same conditions in violation of his First Amendment rights. [249] at 10. Gustafson may challenge the policy's potential content restrictions that can be enforced against him. IDOC has not established that the internet restrictions cannot reasonably be expected to resume under this new language. *See Fikre*, 601 U.S. at 241. Gustafson's First Amendment claim based on the current policy's content restrictions is not moot.

### 3. *Vagueness Claim Based on Prohibition of "Romantic" Materials*

Hughes also argues that Gustafson's and Hampton's injunctive and declaratory claims based on the March 2020 policy's prohibition of "romantic" materials is moot because IDOC changed the policy in December 2023. [253] at 8–10.

Gustafson and Hampton argue that the government has not met its burden to show it will not change the policy back in the future. [249] at 9–10. But they present no evidence to overcome the presumption that IDOC removed the ban of "romantic" materials from its policy in good faith. *See Speech First*, 968 F.3d at 646.

21

While plaintiffs argue that parole agents could use the new language to impose the same restrictions, they do not present an argument that the new language itself is impermissibly vague. [249] at 10. Gustafson's and Hampton's claims based on the policy's vagueness are moot.

## C.    First Amendment Claim

Gustafson's remaining First Amendment claim challenges the current policy's potential content restrictions for parolees with internet-related offenses as overly broad. The policy states, "if use is permitted, such use may be limited to areas such as counseling, education, religion and employment-related purposes." [244-6] ¶ 10(g). The parties dispute what standard governs Gustafson's claim. Hughes argues that *Turner v. Safley*, 482 U.S. 78, 89 (1987) applies, and a restriction on an inmate's constitutional rights is valid so long as it is "reasonably related to legitimate penological interests." [232] at 21–24. Gustafson insists that some form of heightened scrutiny is required. [249] at 12–13. The Supreme Court has never definitively specified a level of scrutiny for parole restrictions. *See Griffin v. Wisconsin*, 483 U.S. 868, 874 n.2 (1987) (reserving the question of whether *Turner* applies to probation). But the court of appeals has: the *Turner* test applies with equal force to parole conditions. *Felce v. Fiedler*, 974 F.2d 1484, 1494 (7th Cir. 1992); *see also Montoya v. Jeffreys*, 99 F.4th 394, 403 (7th Cir. 2024) (applying *Turner* to substantive due process claims of individuals on mandatory supervised release).

To determine if a policy "is reasonably related to legitimate penological interests," four factors are relevant: (1) whether there is a "valid, rational connection" between the regulation and the governmental interest; (2) whether alternative means

of exercising the right at issue remain available to inmates; (3) the impact accommodation of the right will have on guards, other inmates, and the allocation of prison resources; and (4) the absence or existence of ready alternatives. *Turner*, 482 U.S. at 89–90.[4] Regarding ready alternatives, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 91. The burden is on plaintiffs to disprove the validity of IDOC's policy. *Montoya*, 99 F.4th at 403.

On the first *Turner* factor, Hughes argues that there is a "valid, rational connection" between permitting containment teams to limit access to specific categories and IDOC's interest in public safety and rehabilitation. [232] at 27–30. The parties dispute the validity of limiting internet access for the purpose of rehabilitation. According to IDOC's expert, some parolees should abstain from using the internet because, for individuals who have issues with self-regulation, the internet "may be an obstacle to reintegration" into society and developing healthy

---

[4] Hughes argues that because Gustafson brings a facial challenge, he must show that no set of circumstances exists under which the policy would be valid. [232] at 34 (citing *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008)). In the First Amendment context, a law may also be invalidated as facially overbroad if "a substantial number of its applications are unconstitutional, judged in relation to [its] plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 472 (2010). But the *Turner* test is the appropriate mechanism to address the facial constitutionality of a parole regulation. *See Turner*, 482 U.S. at 90–94 (applying the reasonable relationship test to a First Amendment facial challenge); *see also Prison Legal News v. Ryan*, 39 F.4th 1121, 1129 (9th Cir. 2022) (acknowledging the typical standards for First Amendment facial challenges and applying the *Turner* framework to facial challenge of prison regulation). Gustafson's burden is to show that the policy is not reasonably related to IDOC's penological interests, not that the policy is unconstitutional in all its applications.

habits. [248] ¶¶ 17–19. Access to the internet can serve as a distraction that prevents a sex offender from developing appropriate coping mechanisms to manage underlying problems. [248] ¶ 18. For individuals who have committed offenses related to the internet, "general abstention from using the Internet" may be particularly helpful with rehabilitation. [248] ¶ 19. The internet presents a unique danger as compared to other media because, without restrictions, the internet provides almost unlimited access to information and people which can be detrimental to a parolee's recovery. [248] ¶¶ 21–22, 24. Parolees could even become "the victim themselves" online. [248] ¶ 25.

Gustafson presents evidence to the contrary. IDOC's own expert testified that access to the internet can be a positive for reintegration because it allows a parolee to look for work or perform a remote job, and to stay in touch with family, friends, and the news. [248] ¶¶ 19, 26. IDOC's 30(b)(6) witness acknowledged that not having access to the internet could "impede reintegration" by, for example, prohibiting an individual from looking for jobs. [248] ¶ 19. Plaintiffs' expert testified that internet access bans often do more harm than good because internet restrictions limit medical appointments, employment opportunities, and keeping up with the news. *Id.* As for individuals who have "difficulty regulating their emotions" or "difficulty with impulsive behavior," access to the internet is not detrimental to their progress on supervised release because monitoring can help them learn more control and develop good habits around internet use. *Id.*

24

Although the parties present conflicting evidence of whether there is a valid connection between internet restrictions and rehabilitation, Gustafson does not present evidence that contests the rational relationship between the restrictions and IDOC's interest in protecting the public from sexual abuse. The first factor favors IDOC.

The second *Turner* factor favors plaintiffs. Hughes argues that Gustafson can exercise his First Amendment rights by telephone, mail, or in person communications, and that IDOC's policy does not prohibit watching television or reading books, magazines, or newspapers. [232] at 31. But the constitutional right at issue here is not a general right to communicate or access information. It is the right to free speech via the internet. The internet plays an indispensable role in contemporary life. *See Packingham*, 582 U.S. at 104–05. "[T]he Internet is a medium of communication." *Scott*, 316 F.3d at 737. "While parolees typically have fewer constitutional rights than ordinary persons, *see Morrissey v. Brewer*, 408 U.S. 471, 482 (1972); *United States v. Loy*, 237 F.3d 251, 259 (3d Cir. 2001), [an internet ban] is the early 21st century equivalent of forbidding all telephone calls, or all newspapers." *Holm*, 326 F.3d at 879. To foreclose access to the internet "is to prevent the user from engaging in the legitimate exercise of First Amendment rights." *See Packingham*, 582 U.S. at 108. General access to other forms of communication is not a substitute for communication via the internet.

As to the third factor, the parties present conflicting evidence on what effect accommodation would have on guards, other inmates, and the allocation of prison

resources. IDOC argues that, with the large number of parolees and limited parole agents, the added burden of monitoring the parolees' internet usage without restricting them to particular categories would have an adverse effect upon parole agents and their ability to supervise sex offenders. [248] ¶¶ 67–68. But Gustafson presents evidence this would not be an added burden. The monitoring software is automated to flag high risk events and IDOC's general practice is to check summaries of access on a weekly basis. [254] ¶¶ 14–17.

The fourth factor is also disputed. Gustafson argues that monitoring software is a "ready alternative" to restricting use to counseling, education, religion, and employment-related purposes only. [249] at 20–21. Plaintiffs' expert testified that the monitoring system "does a very good job of deterring people from committing crimes. It helps to reintegrate them back into society, allows them to live life more as they should be living life once they are off of supervision. It helps to give them the skills they need when there is not going to be someone around monitoring them all the time." [248] ¶ 19. Hughes argues that monitoring would be insufficient to protect public safety because it does not prevent a parolee from misusing the internet—it only catches them after the fact. [232] at 36. There is also evidence that internet restrictions can be helpful for individuals with internet-related crimes. [248] ¶¶ 18–19, 26.

To resolve the *Turner* factors, a fact finder would have to weigh the credibility of IDOC's proffered burdens against the efficacy of monitoring software, but weighing evidence can't be done at summary judgment. The parties' cross-motions for summary

judgment as to Gustafson's First Amendment challenge to the current policy's content restrictions are denied.

### D.    Procedural Due Process Claims

The procedural due process inquiry typically entails two steps: (1) whether the plaintiff has a protected interest; and (2) if so, what process is then due. *Bradley v. Vill. of Univ. Park*, 929 F.3d 875, 882 (7th Cir. 2019). If the plaintiff has a protected interest, then courts assess the constitutional sufficiency of the process by employing the test laid out in *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976). *See Montoya*, 99 F.4th at 390 (applying the *Mathews* test to determine whether procedural due process was satisfied in parole context).

The parties do not contest that plaintiffs have a protected First Amendment interest in access to the internet, nor that they are entitled to procedural due process under IDOC's policy. Instead, they disagree as to whether IDOC's process violates procedural due process.[5] To determine sufficiency of process, the *Mathews* test considers three factors: (1) the private interest affected by the policy; (2) the risk of erroneous deprivation of the interest and the probable value of additional or substitute procedural safeguards; and (3) IDOC's interest, including the administrative or fiscal burdens of additional safeguards. *See Mathews*, 424 U.S. at 334–35. Plaintiffs argue that the policy does not satisfy procedural due process

---

[5] While Gustafson and Hampton now both have internet access, the policy permits a containment team to revoke or limit their internet access. [244-6] ¶ 10(c), 10(g). There is still a real threat that they will have to renew their requests for access and will be subject to the challenged post-deprivation process. Therefore, their procedural due process claims based on the current internet policy are not moot.

because it lacks a neutral decisionmaker, criteria, deadlines for determinations, an in-person appeal hearing, and a requirement that IDOC provide parolees rationale for access denials. For all these challenges, the first *Mathews* factor favors plaintiffs because internet access implicates important First Amendment rights.

### 1. Neutral Decisionmakers

Gustafson and Hampton argue that IDOC's internet policy does not provide a sufficiently neutral and impartial decisionmaker, nor a sufficiently neutral and independent arbiter. [211] at 37–47. According to plaintiffs, sex offender treatment providers and parole agents are not neutral because they are "intimately involved in the parolee's supervision and treatment." [211] at 39. I agree that members of the containment team, who are all "currently involved in [the parolee's] diagnoses or treatment," do not qualify as independent decisionmakers. *See Felce*, 974 F.2d at 1499.

But the second *Mathews* factor weighs in IDOC's favor. The policy provides for a neutral arbiter to review access decisions, lowering the risk of erroneous deprivation and making the value of an additional safeguard minimal. *See Montoya*, 99 F.4th at 400–01 (finding a nearly identical IDOC decision-making process satisfied due process because a neutral arbiter was available to review containment team decisions). Under the policy, Brown-Foiles is designated to review appeals. [248] ¶ 9. She does not review appeals when she has been involved in the initial determination, nor does she decide appeals when an IDOC-employed therapist under her supervision was part of the original containment team. *Id.* When the containment team's therapist is not employed by IDOC directly, Brown-Foiles serves as a neutral arbiter

28

as there is no evidence she has a supervisory relationship with them. *See Montoya*, 99 F.4th at 400.

When Brown-Foiles or an IDOC-therapist has been involved in the initial determination, different arbiters are available. The parties agree that Brown-Foile's supervisor, Williams, or the Parole Chief Garnett may hear appeals. [233] ¶¶ 23, 38– 39. Because of her supervisory role, Williams would not be a neutral arbiter of decisions in which Brown-Foiles or IDOC-employed therapists were involved. *See Felce*, 974 F.2d at 1499–1500 (holding reviewing officials were insufficiently independent because they "formed a direct line of supervisors above [the parole agent] and thus had individual interests in supporting his decision."). Plaintiffs do not argue or present any evidence that Garnett is not a neutral arbiter. He would satisfy procedural due process requirements in appeals of determinations decided by IDOC-employed therapists or Brown-Foiles. *See, e.g., Montoya*, 99 F.4th at 400 ("[A] decisionmaker need not be external to an institution to be independent.").

As to the third factor, even if the burden to provide an independent decisionmaker at the initial stage was minimal, it would "not outweigh the second [factor]." *See Montoya*, 99 F.4th at 401. The internet policy provides for a sufficiently neutral and independent decisionmaker as required by procedural due process. *See id*. Hughes is entitled to summary judgment on this claim.

### 2.    *Criteria for Determinations*

Gustafson and Hampton argue that the post-deprivation process is not fair because the criteria used to determine whether a parolee can have internet access are unwritten, open-ended, and subjective. [211] at 47–50.

29

The second *Mathews* factor favors plaintiffs. There is a substantial risk of erroneous deprivation, because, without objective criteria, a parolee who poses no danger to the public and whose rehabilitation would not be hindered by internet access may be wrongly denied access based on arbitrary factors. *See Montoya*, 99 F.4th at 402. Hughes argues that there is a minimal risk of error because the appeals process has a neutral arbiter to review why access was denied. [232] at 51. But this argument misses the point—the policy provides no criteria for an arbiter to determine an appeal and whether the containment team used appropriate criteria in their determination. *See* [233] ¶¶ 42–43.

The probable value of additional or substitute procedural safeguards is high. Hughes argues that this case presents "unique circumstances" because parolees are sex offenders, so the due process analysis must allow for some flexibility. [232] at 50. She presents evidence of the need for flexibility, and how "bright line" rules and rigid policies would hinder determinations. *See* [233] ¶ 29; [248] ¶ 29. But plaintiffs are not asking for a rigid policy or bright line rule, they are asking for the policy to include criteria that guide decisions and restrict the bases upon which an access determination may be made. [211] at 48–50. Without written, objective criteria, there is a risk of arbitrary and capricious decision-making. *See, e.g., Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 301 (1981) ("[S]ufficiently objective criteria" are necessary "to control government action and reduce risk of erroneous deprivation."). When government officials are given the power to interfere with constitutional rights, definite and meaningful constraints to their authority are

necessary. *See Scott*, 316 F.3d at 736 ("[A]gencies of official coercion should, to the extent feasible, be guided by rules—that is, by openly acknowledged, relatively stable, and generally applicable statements" to deter "caprice and whim, the misuse of government power for private ends, and the unacknowledged reliance on illegitimate criteria of selection.").

Hughes argues, correctly, that deference should be given to therapists as medical professionals exercising their professional judgment. [232] at 51; *see also Washington v. Harper*, 494 U.S. 210, 230 n.12 (1990) (describing the deference owed "to medical professionals … who possess, as courts do not, [certain] requisite knowledge and expertise."). But IDOC's own expert witness expressed concerns, and plaintiffs' expert concurred, that therapists may use different criteria to make determinations on access. [233] ¶ 33.

Hughes attempts to rely on *Montoya v. Jeffreys*, 99 F.4th 394 (2024), to argue that written criteria would be inappropriate. [266] ¶ 5; *see also* [232] at 50–51 (citing to the *Montoya* bench trial decision, No. 18 C 1991, 2022 WL 3684446, at *13–15 (N.D. Ill. Aug. 25, 2022). The plaintiffs in *Montoya* challenged IDOC's policy restricting contact between a parent convicted of a sex offense and her minor child while the parent was on mandatory supervised release. 99 F.4th at 397. While there are some similarities between *Montoya* and this case, the policy at issue in *Montoya* had written criteria requiring therapists and parole agents to determine "whether there is reasonable cause to believe that the parolee's child(ren) would be endangered by parent-child contact." [239-1] ¶ 9(b); *Montoya*, 99 F.4th at 398, 402. The policy did not

31

allow contact to be denied for reasons unrelated to safety. *Montoya*, 99 F.4th at 402. In contrast, IDOC's internet policy has no written criteria to guide the containment team when deciding to grant or deny internet access. [233] ¶ 28. Providing written, non-exhaustive factors to guide a team's decision would not inherently limit a containment team from considering an individual's specific circumstances. It simply would provide guidelines to prevent arbitrary and capricious decision-making.

Neither party presents facts on the administrative or fiscal burdens of the additional safeguard of flexible written criteria. IDOC presents some evidence that a rigid policy could impede the discretion necessary to make individualized decisions. *See* [248] ¶ 29. But as noted above, plaintiffs are not asking for strict rules (nor are they proposing specific guidelines that would be acceptable to them). IDOC does not present any facts on whether providing guideline criteria would burden containment teams. Since containment teams already use informal criteria in their determinations, *see* [248] ¶¶ 26–27, 29, 31, it seems unlikely that formalizing these criteria to avoid arbitrary decision-making would so burden IDOC that as a matter of law it can prevail on this record. Minor changes to the policy may satisfy due process—minimal criteria satisfied due process in *Montoya*. *See* 99 F.4th at 402; [239-1] ¶ 9(b).

Plaintiffs' motion for summary judgment is granted insofar as due process requires IDOC's internet policy to have some criteria limiting decision-making. But because plaintiffs have not proposed any guidance, further proceedings are required to determine the appropriate scope of any injunctive relief.

### 3. *Deadlines for Determinations*

When a plaintiff is deprived of a liberty interest through an abbreviated pre-deprivation process, such as presented here where internet access may be revoked without any pre-deprivation hearing, due process requires the government offer a more complete opportunity to be heard "within a reasonable" or "sufficiently prompt" time. *Doyle v. Camelot Care Ctrs., Inc.,* 305 F.3d 603, 618 (7th Cir. 2002) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545–47 (1985)); *see also Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1021 (7th Cir. 2000) (holding that when pre-deprivation hearings are not required, post-deprivation review must be "prompt and fair."). The degree of promptness required is determined by balancing "the importance of the private interest and the harm to the interest occasioned by delay; the justification offered by the Government for the delay and its relation to the underlying governmental interest; and the likelihood that the interim decision may have been mistaken." *FDIC v. Mallen*, 486 U.S. 230, 242 (1988). This balancing test merely "rephrase[s]" the *Mathews* test. *DeVito v. Chi. Park Dist.*, 972 F.2d 851, 855 (7th Cir. 1992).

The first factor weighs in favor of requiring deadlines. As discussed above, internet restrictions implicate plaintiffs' First Amendment rights. Parolees have a significant interest in a prompt post-deprivation determination.

As to the second factor, IDOC justifies not setting a deadline for determinations by contending that the containment team and therapists need flexibility to make an individualized assessment about a parolee's rehabilitation, which necessarily requires some delay between a request and a determination. [232]

at 50 (citing [248] ¶¶ 3, 26–30); [253] at 23–24. That makes sense. Of course, any thoughtful decision takes time. But the record does not establish the strength of the relationship between this justification and IDOC's underlying interests in public safety and parolee rehabilitation. While there is evidence that agents and therapists have a heavy case load, IDOC does not provide evidence to show how administratively or fiscally burdensome it would be to set a deadline for request determinations. IDOC presents no evidence that requiring a determination by a certain point could affect public safety or rehabilitation. *See* [253] at 23 (offering only a hypothetical that incorrectly assumes plaintiffs not only seek a deadline by which an access decision must be made but also a deadline by which access must be granted).

The parties present conflicting evidence as to the third factor, the likelihood of an erroneous interim decision. IDOC asserts that because there is an appeals process that the likelihood of error is low. [232] at 51. But, as discussed above, the policy provides no criteria for making determinations and no limitations on when or why access can be revoked or restricted. Further, an appeals process does nothing to mitigate the potential of erroneous deprivation before appeal.

Hughes again attempts to rely on *Montoya* to say that due process does not require quicker decisions. [266] ¶ 5. But the policy in *Montoya* had a formal request process. 99 F.4th at 398, 402. Containment teams had to make determinations within 21 days of the parent's contact request and had to review any restrictions or prohibitions every 28 days. *Id.*; *see also* [244-6] ¶ 9 (IDOC's policy on parental requests for contact). The policy at issue here has no timeframe at all, risking

34

indefinite erroneous bans or restrictions. The right to contact one's children (at issue in *Montoya*) weighs more heavily than the right to internet access, but prohibiting or restricting access to the internet is a serious enough deprivation to require some guardrails against a bureaucratic black hole.

While the record is limited on the likelihood of erroneous interim decisions and the administrative or fiscal burden on IDOC if deadlines (or even softer estimated timeframes) are required, plaintiffs' interest in access to the internet is sufficiently strong that procedural due process would require a "sufficiently prompt" post-deprivation process. The plaintiffs do not request a specific timeframe, nor do I propose one. But the Constitution does require containment teams to make post-deprivation decisions "promptly." IDOC's current internet policy makes no reference to a timeline at all. Plaintiffs' motion for summary judgment is granted as to their due process claims based on the lack of deadline for post-deprivation decisions. The scope of the appropriate injunctive relief requires further proceedings.

### 4. *Meaningful Opportunity to be Heard*

"The fundamental requirement of [procedural] due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 333. Plaintiffs argue that IDOC's appeal process does not provide a meaningful opportunity to be heard because containment teams are not required to provide any rationale or evidence for denying access, and there is no in-person hearing when appealing a decision. [249] at 28. Thus, plaintiffs are not afforded a realistic opportunity to present and rebut evidence. [249] at 28.

The right to receive notice of the factual basis for a deprivation and have a fair opportunity to rebut the government's factual assertions is a basic requirement of procedural due process. *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004). The type of notice required will vary depending on the circumstances of the deprivation. *Klimashevsky v. Drug Enf't Admin.*, No. 23-1543, 2024 WL 76363, at *2 (7th Cir. Jan. 8, 2024). For example, in *Montoya*, the policy's requirement that containment teams provide parents "reasons for . . . restriction or prohibition briefly, in writing" was sufficient. [244-6] ¶ 9(j); 99 F.4th at 400.

IDOC presents some evidence that containment teams do provide parolees reasons for access denials. [253] at 22–23. When Gustafson was first denied access, he was provided a copy of the Use Plan, which included a section stating, "You have been denied access to the internet in any form for the following reason: Insufficient sex offender therapy sessions and no recommendations regarding computer use from therapist at this time." [235-1] at 12. But the internet policy does not require containment teams to provide their reasons for a denial, via the Use Plan or any other method. [244-6] ¶ 10. While Gustafson may have received reasons once, there is a dispute whether he would receive reasons for a future denial. There is evidence in the record suggesting that the Use Plan may not be universally used. *See* [213-5] ¶ 139:10. Further proceedings are required to resolve this factual dispute, the parties' cross-motions for summary judgment based on this aspect of plaintiffs' due process claims are denied.

Plaintiffs also argue that due process entitles them to an in-person hearing on appeal. [249] at 28. Due process generally does not require an in-person hearing when written submissions are an adequate method of resolving a dispute. *See Montoya*, 99 F.4th at 400; *Loudermill*, 470 U.S. at 546 (holding an opportunity to respond is afforded when a party has "the opportunity to present reasons, either in person or in writing, why proposed action should not be taken."). Plaintiffs do not explain why written submissions would be inadequate. *See Brown v. CACH, LLC*, 94 F.4th 665, 667 (7th Cir. 2024) ("Summary judgment is the 'put up or shut up' time in litigation."). Defendants' motion for summary judgment is granted as to the claim for an in-person hearing.

## IV. Conclusion

Defendants' Motion for Summary Judgment, [231], is granted in part. All claims against defendant Dixon are dismissed, and the Clerk shall terminate Dixon as a party to this litigation. Gustafson's and Hampton's injunctive and declaratory claims against Hughes based on the March 2020 policy are moot. Hughes is entitled to judgment as a matter of law on Gustafson's and Hampton's procedural due process claims challenging the neutrality of decisionmakers and the lack of an in-person hearing on appeal.

Plaintiffs' Motion for Summary Judgment, [211], is granted in part. Gustafson and Hampton are entitled to judgment in their favor on their claims against Hughes for procedural due process violations based on the December 2023 policy's failure to include criteria and deadlines for determinations. But the appropriate relief requires further proceedings.

Both parties' motions are denied as to Gustafson's First Amendment claim against Hughes based on the December 2023 policy's categorical restrictions, and Gustafson's and Hampton's procedural due process claim against Hughes based on IDOC's alleged failure to provide parolees reasons for access denials.

ENTER:

Manish S. Shah
United States District Judge

Date: July 22, 2024

38